**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:17-cv-174-FDW**

| | | |
|---|---|---|
| **KENNETH ANTHONY BATTLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **N.C. DEPARTMENT OF PUBLIC SAFETY –** | ) | |
| **PRISONS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on *pro se* Plaintiff's "Letter of Declaration," (Doc. No. 42), Motion to Amend Complaint Adding Defendants, (Doc. No. 70), Motions for the Appointment of Counsel, (Doc. Nos. 76, 93), and Motion to Compel Discovery, (Doc. No. 86), and on Defendant William Jones' Motion to Dismiss, (Doc. No. 49), Defendant Keith D'Amico's Motion for Summary Judgment, (Doc. No. 64), and Plaintiff's Defendant Gary Sobel's Motion to Dismiss, (Doc. No. 71).

## I.    BACKGROUND

Plaintiff filed a *pro se* Amended Complaint, (Doc. No. 14), pursuant to 42 U.S.C. § 1983 that passed initial review on his claims against Defendants Bailey, Bell, Clark, Coble, Crisp, D'Amico, Geouge, Hall, Hensley, Jones, Litaker, Porshia, Quintero, Swink, Tate, Taylor, Thompson, and Waltz for deliberate indifference to a serious medical need; against Defendants Bailey, Geouge, Hensley, and Porshia for retaliation; and against supervisory Defendants Anderson, Beaver, Chapman, Glick, Penland, Pittman, Taylor, and Watson for failing to stop their subordinates' misconduct. (Doc. No. 32).

**(1)**    <u>**Amended Complaint**</u>[1] (Doc. No. 14)

Construing the Amended Compliant liberally and accepting the allegations as true, Plaintiff has suffered from a severe latex allergy since 2014, for which he had a medical "490" card when he arrived at Alexander C.I. (Doc. No. 14 at 15). The allergy precludes Plaintiff from using the plastic/nylon mats or pillows that prisons provide for bedding. Plaintiff has had a doctor's order for cloth-only mattresses and pillows since 2014. Using plastic/nylon mats and pillows causes skin reactions including severe pain, redness, bruising, itching, irritation, cracking, and peeling with sores. His allegations cover incidents that allegedly occurred at Alexander C.I., Avery-Mitchell C.I., and Albemarle C.I.

Plaintiff alleges that, at Avery-Mitchell C.I. in November 2015, Defendant D'Amico ordered a patch test in which a piece of latex was taped to Plaintiff's left arm despite Plaintiff's prior diagnosis with a latex allergy in an attempt to test the allergy for himself, which he is not qualified to do. The latex remained on Plaintiff's skin for hours which eventually caused Plaintiff to call a medical emergency due to pain, injury, and scarring.

At Albemarle C.I. on November 24, 2016, Defendant Coble touched Plaintiff's stomach while wearing latex gloves despite knowing about Plaintiff's severe latex allergy. His actions caused Plaintiff to have a severe skin reaction on his stomach are of pain, redness, and bruising.

At Alexander C.I., Defendant Jones ignored Plaintiff's prior diagnosis of a latex allergy and the need for cloth mattresses and pillows. He stopped "all treatment and precautions" that were previously prescribed by other physicians. (Doc. No. 14 at 17). On May 30, 2018, Plaintiff had an appointment with Defendant Jones where he reviewed the dermatology reports confirming his latex allergy, Plaintiff's medical notes, and a "490" showing that Plaintiff needs cloth mattresses

---

[1] Only the allegations against the Defendant Jones, Sobel, and D'Amico are included in this section.

and pillows. Defendant Jones renewed Plaintiff's "490" for cloth mattresses and pillows. However, later that evening, a nurse informed Plaintiff that Jones changed the "490" at the request of Defendants Hall and Bell, and removed all information about Plaintiff's latex allergy from his medical "490."

As injury, Plaintiff alleges that, when he is touched during searches with latex gloves that have caused severe skin reactions with pain, redness, bruising, itching, cracking, and peeling with sores. This also happens when he is made to sleep on plastic/nylon mattresses and pillows. He then states *verbatim* "Given triamcinolone acetonide ointment USP, 0.1%, I require cloth mattresses and pillows to use as bedding, however Alexander C.I. has refused to order them for me." (Doc. No. 14 at 14).

Plaintiff requests emergency injunctive relief, compensatory damages, punitive damages, and any additional relief the Court deems just, proper, and equitable.

## (2) **Defendant William Jones, M.D.**

### (A) **Motion to Dismiss** (Doc. No. 49)

Defendant Jones argues that Plaintiff's claims against him should be dismissed pursuant to Rule 12(b) of the Federal Rules of Civil Procedure because Plaintiff failed to exhaust his available administrative remedies prior to bringing this action as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).

Defendant Jones argues that Plaintiff filed the original Complaint on June 21, 2017 and failed to name Defendant Jones as a Defendant. The Amended Complaint was filed on June 26, 2018 and included a claim against Defendant Jones. The allegations against Defendant Jones stem from one interaction with Plaintiff on May 30, 2018 at Alexander C.I. None of the exhausted grievances, which involve issues that occurred in 2015 and 2016 at Avery-Mitchell C.I. and

Albemarle C.I. provided notice to Defendant Jones or NCDPS about the basis of the lawsuit or allegations against him. Plaintiff has only submitted one Unit Grievance from Alexander C.I. which was submitted after Plaintiff filed his Complaint and it makes no reference to a claim against Defendant Jones. Plaintiff's exhaustion of three grievances before filing this suit establish that the administrative remedy procedure was available to Plaintiff and that he was not thwarted from using the administrative remedy procedure.

### (B)     Roseboro Order (Doc. No. 58)

The Court notified Plaintiff of the applicable legal standards, his burden to respond to Defendants' Motion, and the consequences of failing to do so.

### (C)     Plaintiff's Responses (Doc. Nos. 62, 82)

Plaintiff argues that he properly exhausted the available administrative remedies with regards to his claims against Defendant Jones. He claims that he exhausted Grievance Number 07438, with Step 1 being received on May 31, 2018, Step 2 being received on May 31, 2018, and Step 3 being received on June 26, 2018, which completed all available appeals and satisfies the PLRA.

### (D)     Defendant Jones' Replies (Doc. Nos. 63, 83)

Assuming that Plaintiff exhausted Grievance Number 07438 through Step 3 of the administrative remedy process, Grievance Number 07438 does not reference any alleged wrongdoing by Defendant Jones and, in any event, Step 3 was not completed until July 11, 2018, which is after Plaintiff filed the Complaint and Amended Complaint in this case. This case should therefore be dismissed as to Defendant Jones.

### (3)     Defendant Keith D'Amico

### (A)     Motion for Summary Judgment (Doc. No. 64)

Defendant D'Amico argues that he should be granted summary judgment because the pleadings and evidence show that he was not deliberately indifferent to Plaintiff's serious medical needs because he did not act with a culpable state of mind or proximately cause injury to Plaintiff; he is entitled to qualified immunity because his actions were reasonable; the Eleventh Amendment bars Plaintiff's claims for compensatory and punitive damages against Defendant D'Amico in his official capacity; Plaintiff's allegations do not support an award of punitive damages against Defendant D'Amico; and Plaintiff's Amended Complaint fails to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure.

**(B)** **Roseboro Order** (Doc. No. 67)

The Court notified Plaintiff of the applicable legal standards, his burden to respond to Defendants' Motion, and the consequences of failing to do so.

**(C)** **Response** (Doc. No. 82)

Plaintiff argues that Defendant D'Amico conducted a latex allergy patch test on Plaintiff which he was not qualified to carry out, rather than referring Plaintiff to a dermatologist. He claims that, by taping latex to Plaintiff's skin for hours and ignoring his plight, he required Plaintiff to declare a medical emergency and caused him pain, injury, and scarring. He claims that Defendant D'Amico also discontinued medication (triamcinolone acet 0.1%) that had been prescribed by Dr. Umsei and P.A. Hendricks on November 18, 2015 prior to Plaintiff's arrival at Avery-Mitchell C.I. without Plaintiff's knowledge. On November 18, 2015, P.A. Katherine Caggiano concluded that Plaintiff was likely allergic to latex and that he should not come into direct contact with it. Defendant D'Amico admits that he was aware of Plaintiff's allergic reaction to latex and had no reason to order a patch test when a dermatology consultation had been requested due to the likelihood of injury to Plaintiff when he comes into contact with latex. Plaintiff has demonstrated

that genuine disputes of material fact exist and that Defendant D'Amico is not entitled to qualified immunity and his claims support compensatory and punitive damages. Rule 9(j) of the North Carolina Rules does not apply to this Eighth Amendment claim of deliberate indifference.

**(D)** **Defendant D'Amico's Reply** (Doc. No. 84)

Neither the Amended Complaint nor Plaintiff's Response provide any basis to conclude that Defendant D'Amico was deliberately indifferent to a serious medical need of Plaintiff's. While Plaintiff alleges that Defendant D'Amico disregarded Plaintiff's prior latex allergy diagnosis, Plaintiff did not have a latex allergy when he saw Defendant D'Amico in November 2015; his latex allergy test was negative on August 10, 2015 and there was no positive test result for a latex allergy in his medical chart. Plaintiff also had a negative reaction to the patch test that Defendant D'Amico ordered on November 4, 2015 and was performed by nurses on November 9, 2015, and Dr. Jones concluded that Plaintiff was not allergic to latex. Therefore, there is no basis to conclude that Defendant D'Amico knew of and intentionally disregarded a serious medical need. Further, Defendant D'Amico specifically ordered that Plaintiff remove the patch test if irritation began and therefore did not ignore Plaintiff's condition during the patch test. To the extent that Plaintiff expresses disagreement with Defendant D'Amico's medical decisions and treatments, his disagreement with the course of care is not actionable and Plaintiff has failed to provide the required expert certification to proceed on a claim of medical negligence pursuant to Rule 9(j). Plaintiff has failed to include substantive arguments to address Defendant D'Amico's assertions of qualified immunity, Eleventh Amendment bar, and lack of support for punitive damages.

**(4)** **Defendant Gary Sobel, D.O.**[2]

---

[2] Defendant Sobel is referred to in the Amended Complaint as "Dr. Coble."

**(A)** **Motion to Dismiss** (Doc. No. 71)

Defendant Sobel argues that the claims against him should be dismissed because Plaintiff fails to state a claim, failed to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure, and failed to exhaust the available administrative remedies.

With regards to exhaustion, Defendant Sobel argues that the three grievances that Plaintiff exhausted do not involve Plaintiff's claim against Defendant Sobel for the care he provided on November 24, 2016. Of the six additional grievances Plaintiff filed, one of them does refer to Defendant Sobel's care but it was not exhausted through the entire appeal process.

The allegations against Defendant Sobel fail to state a claim upon which relief can be granted because the only allegations are that Defendant Sobel examined Plaintiff while wearing latex gloves on November 24, 2016. Plaintiff fails to adequately allege that Defendant Sobel knew about the latex allergy or that any such allergy existed. At most, Plaintiff claims medical negligence but Plaintiff failed to comply with Rule 9(j) by providing a proper expert certification.

**(B)** **Roseboro Order** (Doc. No. 73)

The Court notified Plaintiff of the applicable legal standards, his burden to respond to Defendants' Motion, and the consequences of failing to do so.

**(C)** **Response** (Doc. No. 79)

Plaintiff alleges that Defendant Sobel "misus[ed] his power and judgment" by touching Plaintiff's stomach area while wearing latex gloves, "knowing that [Plaintiff] had a severe allergy to latex." (Doc. No. 49 at 4). Defendant Sobel's actions caused Plaintiff to have severe skin reactions that required medication to help stop the pain, redness, and bruising. Defendant Sobel ignored Plaintiff's plight about the severity of the allergy, including disregarding Plaintiff's prior diagnoses and treatment of the latex allergy that exposed him to an unreasonable risk of serious

harm. Defendant Sobel is not entitled to qualified immunity and the claims against him are not barred by the statute of limitations. Punitive damages area available because Defendant Sobel refused to err on the side of caution and wore latex gloves while examining Plaintiff while Plaintiff lay on the examination table with his eyes closed and in pain. Plaintiff was at imminent risk of serious and irreparable harm and Defendant Sobel knew he was doing something dangerous that was likely to hurt Plaintiff. Defendant Sobel and Plaintiff had previously discussed Plaintiff's severe latex allergy. This qualifies for punitive damages. Defendant Sobel ignored well-qualified doctors who chose to err on the side of caution and follow he recommendations that they had made, and instead chose to touch Plaintiff's stomach with gloves on before Plaintiff recognized the danger.

### (D) **Defendant Sobel's Reply** (Doc. No. 80)

Plaintiff's allegations do not indicate that Defendant Sobel acted with deliberate indifference and it is questionable whether Plaintiff even had a latex allergy. Plaintiff's Response characterizes his claim as one of medical malpractice, which subjects this case to dismissal for failure to comply with Rule 9(j). Plaintiff has also failed to plausibly allege that he exhausted his administrative remedies.

### (5) **Evidence**[3]

### (A) **Affidavit of Keith D'Amico, PA** (Doc. No. 65)

Defendant D'Amico is a licensed Physician's Assistant. He was contracted to provide care as a PA at Avery-Mitchell C.I. during the relevant times and he had no involvement with Plaintiff while Plaintiff was housed at any other institutions. D'Amico reviewed Plaintiff's medical records and has personal knowledge of Plaintiff's case.

---

[3] This section is not exhaustive.

If an inmate wants an appointment in a medical clinic without a regularly-scheduled follow-up appointment, he must submit a Sick Call Appointment Request containing his complaints. The Sick Call Appointment Request is reviewed by a triage nurse who reviews the complaints, triages them, and schedules an appointment with a nurse. At the Sick Call Appointment, the nurse assesses the inmate and records his complaints as well as the nurse's observations, assessments, and plans. The nurse determines at the appointment whether the inmate or his chart is to be seen by another healthcare provider and makes such referrals, if necessary. An inmate is not scheduled for an appointment with the physician or a mid-level provider such as a PA unless he is referred by the nurse. The inmate's chart is not submitted for review unless the nurse refers the chart for review by the physician or a mid-level provider such as a PA. Generally, inmates not seen or examined by NCDPS physicians or mid-level providers in the absence of objective findings documented by the nursing staff that relate to the inmate's subjective complaints in the Sick Call Appointment Request.

On April 14, 2015, Plaintiff complained that he broke out in an itchy rash whenever he wore latex gloves. A Radioallergosorbent ("RAST") test was performed on April 18, 2015. Plaintiff tested negative to a latex allergy and was informed of the results on April 21, 2015.

On August 10, 2015, Plaintiff presented to Dr. Joseph Umesi with a rash that allegedly started on his hands after exposure to latex. Dr. Umesi noted Plaintiff's negative BAST result but, out of an abundance of caution, he ordered Plaintiff non-latex shower shoes, permission to stand on blue chunks pads while showering, and use non-latex gloves. Dr. Umesi submitted a Utilization Board ("UR") Request for a dermatologist on August 31, 2015 due to isolated large papules on Plaintiff's neck, chest, and back that were unresponsive to topical steroids and antihistamines.

On October 12, 2015, D'Amico conducted a routine review of Plaintiff's chart for

medication renewal and medical duty status. D'Amico renewed Plaintiff's non-latex status and ordered a cloth mattress, extra socks, non-latex shoes, and blue chunks to stand on while showering. On October 13, 2015, D'Amico submitted a rush UR Request for non-latex shower shoes for Plaintiff.

On November 4, 2015, D'Amico saw Plaintiff in connection with a nurse's referral from an October 27, 2015 Sick Call Appointment, during which Plaintiff complained about his Clobetasol cream he was using for a rash and requested something else for his skin condition. According to Plaintiff, nothing that medical had in stock could help him and he requested to see a provider.

D'Amico reviewed Plaintiff's chart on November 4, 2015 and noted that the UR request for non-latex shower shoes was denied because of the negative RAST test result. Concerned that irritation was going to be a continued problem for Plaintiff for the duration of his sentence, D'Amico ordered a patch test "to verify his latex sensitivity." (Doc. No. 65 at 4). D'Amico's instructions to the nurse was: "cut a 3mm square piece of latex glove – measure, don't guess. Tape to forearm. Place in holding for the first 30m (minutes) after placement and recheck. If without reaction, evaluate 24 hours later. Instruct patient to remove if irritation starts before." (Doc. No. 65 at 4).

The latex sensitivity test was performed on Plaintiff on November 9, 2015. The Nurse taped a 3mm square of latex to Plaintiff's left forearm and he was monitored for a reaction. Krystal D. Kanipe, LPN, noted that there was no reaction 30 minutes after placement of the latex. Ellen D. Hayes, RN then charted "surrounding skin normal including areas that silk tape touched. Two areas resembling the shape of nail marks with the largest being towards outer aspect and next nail inward. Tape securing area is visibly loose to accommodate such action. Patient admits he has

rubbed the area. No swelling or elevation of skin patch area noted. Mr. D'Amico consulted and confirms this is not a true reaction." (Doc. No. 65 at 4).

D'Amico then consulted Plaintiff about his negative RAST test and signs of negative reaction to the patch test. D'Amico explained to Plaintiff that, due to the negative test results, he most likely did not have a latex allergy. Rather, D'Amico believed that it was possible he had an allergy to one of the other materials used in the shower shoes. D'Amico advised Plaintiff that the plan of care was for him to wear shower shoes for one minute starting that night and then double the time worn daily as he increasingly tolerated the material.

D'Amico conducted a routine chart review on November 18, 2015. He noted that the UR Board had approved the referral to a dermatologist and D'Amico ordered that an appointment be set.

On November 24, 2015, Plaintiff was seen by Katherine Caggiano, PA at Boone Dermatology Clinic. Caggiano recommended that Plaintiff avoid latex completely. She did not review or comment on the negative RAST test. The same day, D'Amico reviewed Caggiano's note and placed another UR Request for non-latex shoes for Plaintiff. D'Amico told the UR Board that Plaintiff needed protection in the shower due to multiple skin break downs on his feed and told them to ignore the prior negative latex test. He reiterated that his request for non-latex shower shoes had been previously denied and that immediate response was required.

On February 5, 2016, D'Amico reviewed Plaintiff's chart. Based on the review, D'Amico entered renewal orders for a non-latex cloth mattress, use of non-latex gloves, permission to use extra socks to wear while showering, and issuance of a special shower shoe through the end of his sentence.

During his treatment of Plaintiff, D'Amico conducted chart reviews and physical

examinations, ordered and renewed his prescriptions, ordered and reviewed diagnostic tests and other treatment modalities when Plaintiff's various medical conditions required it, and referred him to physicians when necessary. Plaintiff's RAST test for an allergy to latex was negative in April 2015. Due to the negative test, the pharmacy denied the request for non-latex shower shoes. Due to Plaintiff's continued complaints of irritation, D'Amico re-tested Plaintiff's latex sensitivity with a monitored patch test in October 2015, which also came back negative. The next month, Plaintiff was referred to and seen by a dermatologist who suggested avoidance of latex. That same day, D'Amico promptly submitted a UR Request for non-latex shower shoes based on the dermatologist's recommendations and instructed the pharmacy to ignore prior negative latex allergy results.

At no time did D'Amico disregard the symptoms and/or concerns that Plaintiff presented. He took appropriate action and made professional decisions and treatment recommendations/ referrals based on Plaintiff's complaints and test results. D'Amico's clinical decisions were not made for the purpose of causing harm or injury to Plaintiff. D'Amico did not ignore Plaintiff's medical needs or deny him any necessary treatment or diagnoses for his latex allergy. D'Amico attentively ordered another allergy test to confirm Plaintiff's belief that he was allergic to latex despite the negative RAST test. D'Amico denies Plaintiff's allegations about D'Amico's care and treatment and denies that he was deliberately indifferent to Plaintiff's alleged latex allergy.

Based on his education, training and experience as a PA, D'Amico is qualified to order an allergy test including a patch test and diagnose a latex allergy. (Doc. No. 65 at 7).

**(B)**    **Medical Records**

4/14/15    <u>Clinical Encounter</u> (PA Hendricks); Plaintiff complains of itchy rash whenever he wears latex gloves, says he thinks he is allergic to latex; RAST test ordered (Doc. No. 65-2 at 2)

4/16/15        NCDPS Allergy Form Lab negative for latex allergy (Doc. No. 65-2 at 7)

8/10/15        Clinical Encounter (Dr. Umesi); Plaintiff presents with rash that started on his hands after exposure to latex; PA Hendricks gave a 490 form for non-latex gloves; RAST was negative but he breaks out each time he touches latex; rash is up his arms, chest and back; new medication orders for rash; follow up at Sick Call as needed (Doc. No. 65-3 at 2)

8/31/15        Consultation/Referral Form (Dr. Umsei); appointment at Boone Dermatology 11/24/15 for papules on neck, chest and back that are not responsive to topical steroids and antihistamines (Doc. No. 65-3 at 5)

               UR Request dermatology consultation approved (Doc. No. 65-3 at 6)

10/12/15       Medical Duty Status (PA D'Amico); no latex mattress, cloth only; allow Plaintiff to use non-latex gloves due to latex allergy until EOS; Plaintiff has latex allergy, causing severe skin reactions, cannot wear state-provided shower shoes for any length of time; may have extra socks for showering; may have blue chunks to stand on while showering (Doc. No. 65-4 at 2)

10/13/15       UR Request (PA D'Amico) non-latex shower shoes; Plaintiff has severe latex allergy; ignore RAST test (Doc. No. 65-4 at 3)

10/27/15       Clinical Encounter (RN Hughes); Plaintiff requests a different allergy cream; appointment scheduled on 11/2/15 with "Physician Extender" and chart review with physician; cosign/ review by D'Amico (Doc. No. 65-5 at 2)

11/4/15        Clinical Encounter – Administrative Note (PA D'Amico); pharmacy states they could not source a latex free shower shoe; Plaintiff's latex lgE is negative; will verify latex sensitivity as this will be a concern for the duration of his sentence
               Nursing Instructions: "Cut a 3mm square piece of latex glove, measure, don't guess. Tape to forearm. Place in holding for the first 30 minutes after placement and recheck. If without reaction, evaluate 24 hours later. Instruct patient to remove if irritation starts before." (Doc. No. 65-6 at 2)

11/9/15        Clinical Encounter (RN Hayes); Plaintiff says "I am feeling itchy and my skin is burning and stinging. I have tried not to scratch it. I have rubbed it through the bandage." Surrounding skin normal, two areas resemble the shape of a nail, no swelling or elevation of skin patch area noted; "Mr. Damico consulted and confirms this is not a true reaction." Follow-up at sick call as needed, return immediately if condition worsens, discharged to housing unit. "Counseled by Mr. Damico about negative rast and signs of negative reaction. Advised for plan of care to wear shower shoes for one

minute starting tonight and double time daily. Provider expressed that it not a latex allergy but rather a possible material allergy that is used in making of shower shoes causing irritation." (Doc. No. 65-7 at 2)

Clinical Encounter (LPN Kanipe); 30 mins after placement of 3mm latex piece to left forearm, no reaction noted at this time. "pt c/o itching at latex site;" "Latex allergy response;" "redness noted to area that piece has touched. No edema noted;" "rtc if breathing becomes difficult or area of latex becomes intolerable" cosigned by D'Amico (Doc. No. 65-7 at 4)

| | |
|---|---|
| 11/18/15 | Clinical Encounter – Administrative Note (MRA III Ledbetter) UR approved and appointment scheduled for Boone Dermatology on 11/24/15 (Doc. No. 65-8 at 2) |

Clinical Encounter – Administrative Note (PA D'Amico) patient has symptoms of a latex allergy, lgE latex neg lab, has UR approval for derm and POD, will get appts addressed today
New Medication Orders: Hydrocerin Cream, Simethicone
Discontinued Medication Orders: Triamcinolone Acet 0.1% (Doc. No. 65-8 at 3, 4)

11/24/15    Boone Dermatology Report (PA-C Katherine Ceggiano) Impression: "Allergic contact dermatitis, likely to latex, with Id Reaction…." Plan: "Avoid latex completely. Recommend that patient use non-latex shower sandals and be searched with non-latex gloves in the future….;" Reviewed by Dr. Uhren on 12/10/15 and PA D'Amico on 11/24/15 (Doc. No. 65-9 at 2).

Clinical Encounter – Administrative Note (PA D'Amico) Urgent UR Request for non-latex shower shoe; Reason for Request: "Severe reaction to Latex with residual scarring. Patient needs shower shoe non latex. He is walking barefooted on the shower floor with open wound from prior reaction to Latex Shower shoe. Have ordered before, Response is to order from different place. Not acceptable. I diagnose, no knowledge of purchase trails. Patient need foot protection today;" Provisional Diagnosis: "Severe latex allergy." (Doc. No. 65-9 at 7)

UR Summary request for shower shoes approved (Doc. No. 65-9 at 8)

1/26/16    Inmate Medication Refill Request Triamcinolone Acet. 0.1% cream; Nursing Staff Response; "Current order expired, you will need to fill out a sick call form if you need this medication continued;" Additional comments: "Discontinued by provider 11/18/15" (Doc. No. 82 at 18)

2/5/16    Medical Duty Status (D'Amico) Chart review; Comments: "Allow the

offender to use non-latex gloves due to latex allergy until EOS. Inmate has LATEX allergy, causing severe skin reactions. Cannot wear state provided shower shoes any length of time. May have extra socks to wear while in the shower. Issued special shower shoes, white mesh with rubber sole to EOS." (Doc. No. 65-10 at 2)

9/8/17  Clinical Encounter – Administrative Note (MD Broadwell) Conclusion: "negative IgE to latex and a negative patch test, yet dermatology recommends latex avoidance;" "please order new non-latex shower shoes" (Doc. No. 65-9 at 10)

**(C) Grievances[4]**

11/4/15  Administrative Remedy Procedure (4680-2105-YBA-**00325**) at Avery-Mitchell C.I.

Grievance Statement: "I'm sending this complaint, as an emergency and confidential grievance; because of fear and well known retaliatory actions that occur here at Avery-Mitchell Correctional Institution that goes unattested, such as racial discrimination and harassment, by staff, willfully, at this facility. I've been singled out because of my skin color and nothing was said to the Caucasian inmates; concerning the same issue. I'm placed in drastic situations daily, by being constantly surrounded by Caucasian officers, which is very uncomfortable for me, especially since using the administrative remedy process against an officer (Clark), officer (Porshia) and captain (Pittman) for 'acting tyrannical under the color of state law, and, willfully endangering my life.' Some of the officers in supervisory positions are unapproachable and have formed in their minds that 'all inmates are liars' as quoted by Captain (Pittman). So in conclusion, I will not receive an adequate or truthful investigation, if conducted at this facility.

On Oct 25, 2015 at lunch time, for special diets; I looked through the window and noticed all the inmates were wearing latex gloves on the serving line, handling trays and serving food which is a clear violation of policy.

I told the officer in charge of the serving line, and the inmates that 'I have severe allergic reactions to latex.' My plea went ignored in spite of my health warning. I spoke to officer Porshia and explained the situation and he arrogantly blew me off. I further explained how dangerous latex is to my health, but officer Porshia continued to be willfully negligent and indifferent to my health hazard. Officer Porshia kept asking me the same question, 'are you going to eat or what?' I said 'yes! But I can't eat food that's been handled with latex.' He, then called officers Clark and Hensley to the area and I explained to them the same problem – latex allergy's. The officers began making unprofessional comments.

I then stated under duress that 'I have a medical 490 about latex

---

[4] The bolded grievances were exhausted before this lawsuit was filed.

allergys, that causes severe skin reactions.' I pulled up my sleeves to show the officer's my skin starting to breakout, as well as my neck, and then inside of my mouth. I told them 'this latex allergy could kill me!' Officer Clark responded inhumanely 'well after you die, fill out a grievance!'

These actions are deliberately indifferent, unwarranted, sadistic and homicidal. Officer Clark's openly loud comment shows reckless regard for human life- or an inmate's life, and his conduct is in direct violation of N.C.G.S. § 148-11 … Code of Conduct, and Chp. F. 1605 Duties of Correctional Officer's, Section (e)… No inmate shall be unnecessarily exposed to conditions which will endanger the health of the inmate. Officer's Clark and Porshia also exhibited 'Deliberate Indifference' … by their actions which could have caused me injury by them not acting to my valid medical complaint…. Deliberate indifference and willful neglect, by a prison official.

I asked to speak to the captain on duty, Officer Clark kept telling me 'I don't need to speak with the Captain!' And then, said 'why do you want to speak to the Captain?' I told him, 'because you're not helping me.' Then, officer Clark told the officer to fix me another tray without latex gloves, but I received the same contaminated tray with the meat changed. I went back to get a cup and the officer slammed the cup down on the counter – unprofessional behavior.

I asked Officer Clark and Porsha once again if I could speak to the Captain, Officer Porshia replied 'look dude, just sit down and eat.' The situation began to spiral out of control so I left, Officer Clark told me to 'speak with the sergeant in the unit if I wanted to speak with the Captain.'

Thus returning to my unit, I spoke with Sergeant Woody in reference to what had occurred. Sgt. Woody notified the duty lieutenant of the situation in hopes of me being able to speak with the Captain. Sgt. Woody told me 'the lieutenant stated he would pass my complaint on to the Captain and if they needed to speak with me, that, they will get with me.'

At dinner, same scenario … latex gloves being worn on the serving line. I told the inmate on the serving line of my latex allergy. The inmate was very apologetic, changed his gloves to the clear serving gloves, then fixed my tray without any problems.

Captain Pittman, being in the dining hall during last meal, I approached him, asking him if I could talk with him reference the incident that took place during lunch. I then explained the entire scenario about the latex gloves, and my allergy to them. I then told him of the sadistic comment that Officer Clark had made. Captain Pittman stated 'I can't control what the kitchen does.' I then asked 'well, what about the sadistic comment Officer Clark made, telling me that after I die, to fill out a grievance, when I told him that this latex allergy could kill me.' Captain Pittman stated 'Clark didn't say that.' After I repeated the sadistic comments made by Officer Clark, Captain Pittman's comment betrayed him. He knew from his comment that Officer Clark made the derogatory statement! I pleaded with

Captain Pittman, that I wasn't lying and I had other inmates who heard and witnesses what was said. Capt. Pittman responded, 'All inmates are lier's, and if my officer say he didn't make those comments, then he didn't make them.' Captain Pittman then told me to go away, 'shooing me off, with his hand.

Captain Pittman has clearly demonstrated willful 'deliberate indifference' by his actions and comments. Cpt. Pittman's conduct, as well, was very unprofessional, in direct violation of N.C.G.S. § 148-11 code of conduct, and chp. F.1605 … Duties of Correctional Officer's, section (e) … No inmate shall be unnecessarily exposed to conductions which will endanger the health of the inmate. Cpt. Pittman also violated my 5th Amendment Rights of the U.S. Constitution's due process clause, by refusing to investigate the tyrannical behavior of Officer's Clark and Porshia concerning my allergic reaction to latex.

Capt. Pittman, Officer Porsha and Officer Clark also violated Chp. A.0200 Conduct of Employees', section (e.) Discrimination, harassment and racial issues (1.) Employees will treat all inmates with equal dignity and courtesy, (e.) Employees should be provided training in human relations so that cultural barriers impeding effective communication between inmates' and staff may be removed.

After this incident, I am worried and some-what frightful to be on this camp, having to be around these officer's whom are being addressed in this grievance. I don't fear … for my life, nor do I need protective custody. However I do fear retaliation and/or reprisal. I will be placed in situations where these officer's may be supervising me, which could result into retaliatory situations. If not reprisal from the noted officers. Surely it will come from other staff on this camp.

I have already started receiving reprisal from staff, being told that the only reason I am pushing this, and writing this grievance, is because I don't want to be here at this facility. Comments like that, plus knowing there's a lot of racism here at this facility, which makes me very uneasy and concerning. This scares me to the point that I can't function properly, as I am very intimidated by the ethnic differences by staff at this facility. Again, I don't fear for my life at this time, but I do fear retaliation which undoubtedly will happen as long as I'm housed at this camp!

I fear being setup or falsely accused of something I didn't do. I fear of being placed in segregation because of reprisal. I already know there will be a target placed on my back. It is well known that inmates are sent to Avery/Mitchell for punishment or retaliatory purposes, to be made an example of. This facility bears the type of reputation of being cruel, over bearigh, controlling and degrading. With that said, and member's of supervisory staff making the comments 'all inmate's are liars' as quoted by Capt. Pittman, assures me I will not receive an adequate or comprehensive investigation, if conducted by this facility.

On Oct. 31, 2015 at dinner time Officer Garland made a demeaning

comment about me, over the radio saying, 'what, he afraid to get his hands dirty.' I have to wear non-latex gloves when I walk off the unit. I stated to Officer Cooper, out of frustration, 'she needs to mind her business.' Officer Cooper then got billigerant [sic] and pointed his finger in my face, raising his voice to me, stating 'you better watch your mouth.' Officer Cooper could literally be charged with assault and communicating a threat. His conduct was unprofessional. This is another example of harassment and reprisal due to my latex allergy.…

The officers' had knowledge and proof of how dangerous my latex allergy is to my life, because I told them and showed them the beginning outbreaks on my skin, which was made into a comical situation by the officer's and they are in direct violation of N.C.G.S. § 148-19, Health Services, by not seeking 'Preventive' measures to the problem.

I have also included 'witness statement's' of several inmate's whom are willing to verify the validity of complaint or grievance. These inmate's were present when the incident took place.

There shall be no reprisals for the exercise of my Constitutional Rights, being supported also by the Department of Public Safety's Policy, and my use of the Administrative Remedy Procedure as outlined by the First Amendment.… Any reprisals will be met in a lawful format of prosecution of any individual or individuals doing such.

There are federal laws that require people to be treated equally. i.e.: The Civil Rights Act of (1964) and (1991), Rehabilitation Act of (1973), Civil Rights Restoration Act of (1987) and Americans With Disabilities Act of (1990).

The Department of Justice protects the rights of individuals confined in institutions operated by a state or local governments. I believe that I have been discriminated against, and plan to file a complaint with the, U.S. Department of Justice; Civil Rights Division Criminal Section, Washington, D.C."

Requested Remedy: "To be transferred from this facility, from this region and relocated back to the Raleigh regional area. For the officer involved to face disciplinary and training in human relations/cultural barriers." (Doc. No. 5 at 75)

11/18/15    Letter from Taylor to Plaintiff re unprocessed grievance addressed to the Director of Prisons (Doc. No. 5 at 73)

11/23/15    Screening Response (4680-2015-YBA-00325) by Mark Geouge; grievance has been accepted (Doc. No. 5 at 74)

11/30/15    Step One Response (4680-2015-YBA-00325) by Mark Geouge; In response to your grievance that was accepted on 11/23/15 in concerning the use of latex gloves on the serving line and treatment you received from staff on 10/25/15, the following has been determined. Officer Clark states at no time

18

did he instruct you to write a grievance after you die, he stated that he instructed you to write a grievance when you returned to the housing unit if you felt the need. Officer Clark further reports that after you informed him of your latex allergy, he informed kitchen staff who in turn had all inmates on the serving line change to the clear gloves. Officer Clark also states that when you requested to speak with the captain, he instructed you to request this thru your unit sergeant. Officer Porshia states that inmate Battle informed them that he was allergic to latex and that Officer Clark informed the kitchen. Officer Porshia further states at no time did [sic] make any unprofessional comments or act unprofessional towards inmate Battle. Officer Hensley reports at no time did he make any unprofessional comments around or towards you. Officer Hensley also states he did not witness Officer Clark or Porshia say anything unprofessional to you. Capt. Pittman states that he did speak to you concerning complaints about officers Clark and inmates wearing latex gloves in the kitchen. Capt. Pittman reported that the situation in the kitchen had already been resolved and Officer Clark had already talked to him about the situation with inmate you earlier in the day. Capt. Pittman also states if any kind of investigation or counseling is done between him and his staff, you nor any other inmate is privileged to the outcome of any investigation the [sic] has been conducted once a complaint has been alleged. Capt. Pittman further reports he did not state 'all inmates are liars' nor did he shoo you away. He did in fact tell you to go back to the unit after he heard you out, because at the time he was in the middle of the dining hall supervising the evening meal. Capt. Pittman states at no time did he disrespect you. In response to the incident that occurred on 10/31/15 concerning comments made by staff, the following has been determined. Officer Garland states she observed you standing in line for chow wearing blue gloves. She asked Officer Cooper over the radio 'is there a reason that inmate has gloves on.' Officer Garland reports at no time was she demeaning on the radio. Officer Cooper states at no time did he threaten or assault you. He did state that he informed you that you need to watch your mouth after you made a comment that Officer Garland needed to mind her business. It has been suggested that you contact your programmer and follow the proper policy and procedure in submitting a transfer request. (Doc. No. 5 at 91)

12/3/15      Step Two Response (4680-2105-YBA-00325) by Jason Penland; Step One adequately addresses offender's concerns. (Doc. No. 5 at 93)

12/10/15     Step Three Response (4680-2105-YBA-00325) by Jasmine Belyeu; no violation of DOP policy or any evidence of disrespect or abuse of authority by staff, grievance is dismissed for lack of supporting evidence (Doc. No. 5 at 94)

1/8/16       Administrative Remedy Procedure (4680-2016-YBB-00005) at Avery-

Mitchell C.I.; complaining about Geouge, Penland, Solomon, Reel, Clark, Porshia and Hensley, Pittman, Watson, D'Amico, Taylor, Belyeu, and Green (Doc. No. 5 at 3)

<u>Screening Response</u> (4680-2016-YBB-00005) by Emery Cornett; grievance rejected; "More than one incident" re submitting witness statements, staff indifference, violation of his 5th Amendment rights, harassment, retaliation, Step 3 Response, and grievance procedures (Doc. No. 5 at 2)

<u>Administrative Remedy Procedure</u> (4680-2016-YAC-**00014**) at Avery-Mitchell

<u>Grievance Statement</u>: "The physician assistant Keith C. Damico, has committed a violation of his 'Hippocratic Oath' by subjecting me to unnecessary wanton infliction of pain, by his actions of taping latex to my skin for hours – subjecting me to cruel and unusual punishment, and, for basically ignoring my plight about the severity of my latex allergy. I had already been diagnosed by Dr. Umesie and (PA) Hendricks, providers at Harnett Correctional as having this severe 'latex' allergy. (PA) Keith C. Damico basically ignored a doctor's professional medical findings, thus trying to prove an [sic] well qualified doctor wrong, at the cost of my life, thus acting tyrannical under the color of state law, and, willfully endangering my life.

It had already been established that I was allergic to latex because of out-break I had just experienced, and the fact that the state provided shower shoes, which contain latex, had taken all the skin off the bottom of my feet and some toe-nails. All this clearly documented in my medical chart and the medical 490 given to me.

On November 24, 2015, I was taken to Boone Dermatology in Boone NC, where a dermatologist confirmed that I am allergic to latex and not to come in direct contact with same. (PA) Damico has also failed to follow the recommendations of the Dermatologist for the necessary medications need to help repair my damaged skin. His actions are … 'Deliberate Indifference,' the reckless disregard, callous inattention to an inmates needs, cruel and unusual punishment. The Eighth Amendment."

<u>Requested Remedy</u>: blank (Doc. No. 5 at 96)

1/12/16    <u>Screening Response</u> (4680-2016-YAC-00014) by Mark Geouge, grievance has been accepted (Doc. No. 5 at 95)

1/21/16    <u>Step One Response</u> (4680-2016-YAC-00014) by Mark Geouge; "In response to the grievance that was accepted on 01/12/2016, the following has been determined. Medical personnel state they have read all of the documentation from Dr. Umesi and PA Hendricks going back before April 2015 when this first became an issue. At that time they did a laboratory test

20

for a latex allergy and the results came back negative (no allergy). Since you have a history of suggesting you may be allergic to latex anyway they chose to err on the side of caution and treat you as if you did, in fact, have a latex allergy. The skin test ordered by Mr. D'Amico was a way of confirming the allergy even though the original test was negative. And the Dermatology Consult states you are "likely" allergic to latex. It was also Mr. D'Amico who submitted an urgent UR requesting non-latex shower shoes. And the medication recommended by the Dermatologist for your skin rash, reviewed by Dr. Uhren, is the same medication – Triamcinolone Cream – for which you already have a prescription that is valid through 03/12/16. Since you did not list a remedy which would resolve your grievance medical has provided this information as a courtesy and as a way of making you aware of facts you may not have already known." (Doc. No. 5 at 98)

2/11/16    Step Three Response (4680-2016-YAC-00014) by Jasmine Belyeu; staff responded appropriately; grievance is considered resolved; inmate is encouraged to contact medical as needed (Doc. No. 5 at 99)

2/18/16    Administrative Remedy Procedure (4290-2015-YBA-01372) at Warren C.I.; mentioning Geouge, Penland, Pittman, Solomon, Porshia, Hensley (Doc. No. 5 at 17)

2/19/16    Screening Response (4290-2015-YBA-01372) by Sharon Pendergrass; grievance is being rejected because: "More than one incident;" "Already resolved;" and Plaintiff transferred from Avery Mitchell on 2/11/16 (Doc. No. 5 at 16)

5/27/16    Administrative Remedy Procedure (4680-2016-WAB-02196) at Lumberton C.I.; mentioning Sgt. Tate, Lt. Quintero re lack of cloth mattress (Doc. No. 5 at 70)

5/31/16    Administrative Remedy Procedure (4680-2016-WAB-02220) at Lumberton C.I.; mentioning Sgt. Tate, Lt. Quinteo re lack of a cloth mattress (Doc. No. 5 at 67)

           Screening Response (4680-2016-WAB-02196) by Mary Oxendine; grievance is rejected due to "More than one incident." (Doc. No. 5 at 69)

6/3/16     Screening Response (4680-2016-WAB-02220) by Mary Oxendine; grievance is rejected due to "More than one incident." (Doc. No. 5 at 66)

9/15/16    Administrative Remedy Procedure (4580-2016-TILRF-**03446**) at Albemarle C.I.
           Grievance Statement: "On June 28, 2016, I returned back to Avery-Mitchell

C.I. from having foot surgery. I was assigned to the Watauga Unit and placed in dorm WAA-109 which is one of the bigger dorms. This dorm gave me a lot of room between bunk and was suitable for my in my current condition due to the fact that I was wearing two medical boots to help protect my feet from injury, and aid me with walking as my feet attempted to heal. This dorm allowed me space to move around without injuring myself.

On July 3, 2016 I was moved without notice to dorm WBB-109 which is an much smaller dorm. I had barely any room at all to move around or get in between the bunks which I was assigned, let alone I had to share this small walk way with another inmate who had no regard for my disability. Nor did staff take my disability into account what so ever when they moved me, thus placing me at risk for reinjury to my toes. This constitutes and shows that Sgt. Faye who moved my dorm location, who knew before hand of my disabilities and impairments acted with 'Deliberate Indifference' … by his actions which could have caused me injury by him not acting to my valid medical complaint. I asked to speak with Sgt. Faye about the move and he refused to talk to me. This also [is] … 'Deliberate Indifference,' the reckless disregard, callous inattention to inmates needs; Cruel and unusual punishment.

I continued to seek out for help to be moved after I struck my foot on the bunk while attempting to get between the bunks. This injury and the constant walking and standing prompted medical to put me in a wheelchair. Again, I repeatedly pleaded with the supervisor's of the Wautaga Unit to move me to one of the bigger dorms where I could have more room to move around and not get hurt. However my plights for help went unanswered and ignored.

Being now that I was in a wheelchair and even medically disabled, the facility heads or unit management may not act with deliberate indifference to the needs of inmates who have serious handicaps or disabilities under the Americans With Disabilities Act (ADA)…. This is essentially the same protections as the Rehabilitation Act….

Inmates with disabilities are entitled to reasonable accommodations that will enable them to access the facility to include making a dwelling or in this case, the dorm(s), and sleeping area, accessible for disabled inmates, or to provide reasonable accommodations for equal opportunity to enjoy the dwelling.

I continued to ask Sgt. Faye who initially moved me from the star, Sgt. Browning and Sgt. Rockwell. All these supervisor's discriminated against me and my disability by refusing to relocate me to a more accessible dorm with space and room to enter the dorm, and move around, without getting hurt by the bunks, chairs or other inmates. Also, by being confined to a wheelchair, I was unable to maneuver my way through the dorm, nor store my wheelchair in a safe location. So, again, I repeatedly asked to be moved to one of the bigger dorms or one of the bunks located by the stairs

in the dorm, but still my plight was ignored.

On July 9, 2016, I went to Sgt. Rockwell and asked him 'if he could move me to a different dorm because of my feet situation and for the fact of being in a wheelchair, and I had no room to move around.' I further explained to him that 'the inmate whom I shared the vary narrow walkway with between the bunk has no respect for my injured feet and has nearly stepped on them several times.' I then told Sgt. Rockwell that 'I have hurt my Right foot already by hitting my foot on the leg of the bunk, and that I'm scared of being injured further.' Sgt. Rockwell then made an attempt to move me to another dorm, and told me 'to go and pack my things.' Shortly thereafter, Sgt. Rockwell receded telling me 'that I wouldn't be moving, to go back to the dorm I came from.' I then asked Sgt. Rockwell 'why he changed his mind?' Sgt. Rockwell responded stating 'that he had called Sgt. Frye at home, and asked him why he had moved me from my previous dorm?' Sgt. Rockwell said that 'Sgt. Frye told him that I was moved because he was told that I was with a group of other inmates being loud, disruptive and fighting over the phone, therefore he was told not to move me.'

I just sat there in my wheelchair in total disbelief. I told Sgt. Rockwell 'that what Sgt. Frye had told him was far from the truth. That I hardly got off my bunk because of my foot pain and swelling.' I further told Sgt. Rockwell that 'I had only used the phone twice since being in the dorm, and have never argued or fought over the phone at all, nor was I ever loud or disruptive in the dorm, never!' I asked Sgt. Rockwell if he could go back and review the camera footage of the dorm, then ask other inmate's in the dorm of these false allegations, then and only then would he see that I was lied on!' Sgt. Rockwell refused stating 'that I need to talk with Sgt. Frye when he returns on Friday.' The last thing I said to Sgt. Rockwell before I went back to the dorm was 'I can't believe that you guys as supervisor's, would place my safety in danger, where I can be injuried and unable to move around over a lie! A lie that was not properly investigated, because if it had been, it would have shown that the allegations made were false.

What Sgt. Frye or Ms. Hudgins did was to take another inmate or informant's word at face value without doing a proper investigation themselves. Sgt. Frye or whom ever he received this false information did was to violate my rights under Due process clause of the Fourteenth Amendment. It prohibits a state from depriving 'any person of life, liberty or property without due process of law.' This move created a hardship for me and caused supervisor's and others to treat me very differently than the way most prisoners are treated with disabilities…. I was given no chance to refute this false information. No truth was established from the person(s) who gave this information….. Reliability not established by reliance on hearsay evidence without established basis because due process requires hearing official to make independent totality-of-circumstances assessment of informant's reliability. Dorm camera's as witness….

I then took it upon myself to write Ms. Hudgins; Assistant Unit

Manager currently over seeing Watauga Unit, as well as Mr. Hernandez; Facility Administrator. I explained to them the situation hoping to get some help and understanding from them. Instead all I received was more retaliation from the Wautaga Unit Management and it's officer's.

On July 10, 2016 Sgt. Rockwell finally moved me to a different dorm. After being in an altercation with another inmate over him nearly coming down on my injured foot. All this which could have been avoided, if I hadn't been moved from the start based on misleading and untruthful allegations, or moved to a dorm location with more accessibility from the start. The management of Wautaga Unit placed me in a situation that could have become violent with this inmate or other inmates, because of my trying to protect my feet from further injury. These officials turned a blind eye to the risk. They knew of my handicap and disabilities but failed to act, thus violating my Eighth Amendment rights. Living conditions that are fine for non-disabled inmates may be constitutionally inadequate for disabled inmates….

Retaliation from my complaints and letter to Mr. Hernandez has come in the form of rejection of grievances by Ms. Hudgins, sighting that I already have an active grievance in process when I knew I didn't. Ms. Hudgins repeatedly refused to meet with me to discuss these incidents at hand and the grievance problem.

On Friday July 22, 2016 I asked Officer Aldridge 'if he could call Ms. Hudgins and see if I speak with her' and he said 'No'! Officer Aldridge then told me 'to put in an request form.' I responded telling him that 'I had done that already,' he responded back by saying 'no.' I then asked if 'I could speak to the Sgt. on duty,' and again Officer Aldridge said 'no'! I then asked 'why I couldn't talk with the Sgt.' and he responded saying 'look we already told that you were going to make a big deal out of this so just go away!' I then asked Officer Aldridge 'who told him that,' but he refused to answer. It is apparent that I was unfairly being singled out for mistreatment by the supervising management and some of it's officer's within the Wautaga Unit. I was being treated differently than other prisoners and the treatment is not rationally related to a legitimate governmental purpose. Again this shows a pattern of retaliation within this unit as I have shown a chronology of events from which retaliation may be inferred….

All the named officials have acted with Deliberate Indifference. They knew before hand, and was repeatedly told of the substantial risk that I faced in my condition, of serious harm and they disregarded that risk by failing to take reasonable measures to abate it."

<u>Requested Remedy</u>: "For the said officer's and staff to be disciplined for their unprofessional conduct." (Doc. No. 5 at 43)

9/16/16     <u>Screening Response</u> (4580-2016-TILRF-03446) by Rebecca Broadway; grievance accepted (Doc. No. 5 at 42)

| | |
|---|---|
| 10/3/16 | Step One Response (4580-2016-TILRF-03446) at by Michael Thompson; response is late so the grievance is being forwarded to Step 2 automatically; inmate was moved to a bunk to accommodate him, there was no retaliation (Doc. No. 5 at 63) |
| 11/23/16 | Step Two Response (4580-2016-TILRF-03446) by Donald Cleland; the response at Step 1 appropriately addressed the concerns; staff indicate that Plaintiff was moved to maintain order within the unit; inmates do not dictate to staff where they are housed; there is no evidence to support the allegation of retaliation; no further action is warranted (Doc. No. 5 at 64) |
| 11/24/16 | Administrative Remedy Procedure (4580-2016-TILRF-03988) at Albemarle C.I.; mentioning Nurse Supervisor III, Nurse Litaker, Dr. Coble, re medical department and administration ignoring his serious medical need, i.e., severe latex allergy; requests a medical alert bracelet, epi-pen, and top the use of latex gloves in the facility (Doc. No. 15 at 4) |
| 11/28/16 | Screening Response (4580-2016-TILRF-03988) by Samatha Shaver; grievance accepted (Doc. No. 3 at 39) |
| 12/1/16 | Step Three Response (4580-2016-TILRF-03446) by Elizabeth Wallace; re 9/15/16 grievance filed at Albemarle C.I.; re unfair treatment when he asked to be moved to another dorm and foot surgery; staff adequately addressed the grievance concerns; facts found by staff investigator are adopted; grievance is considered resolved (Doc. No. 5 at 65) |
| 5/30/18 | Administrative Remedy Procedure (4870-2018-B1A-07438) at Alexander C.I. mentioning Nursing Supervisor Bell, unit management (Crisp and Hall), and medical department; requesting cloth mattresses and pillows or transfer to a minimum custody facility that will comply with the medical orders (Doc. No. 15 at 24) |
| 5/31/18 | Screening Response (4870-2018-B1A-07438) by Stephanie Hall; grievances is accepted (Doc. No. 15 at 23) |
| 6/4/18 | Letter from Plaintiff to Judie B. Clark complaining about Dr. Jones at Alexander C.I. re 5/30/18 incident (Doc. No. 15 at 18) |
| 6/11/18 | Step One Response (4870-2018-B1A-07438) by Christopher Murray, investigation shows that none of these issues is listed on the OPUS screen and cannot be verified; custody cannot authorize these items as only nylon mattresses are available for safety and security reasons; inmate refused a single cell environment; no evidence of a latex allergy; no further action recommended; inmate should follow up with medical as needed (Doc. No. 82 at 34) |

| 6/18/18 | Step Two Response (4870-2018-B1A-07438) by Benjamin Anderson; investigation shows no indication to support that staff have deliberately denied inmate medically ordered items or accommodations; no further action is required (Doc. No. 82 at 33) |
|---|---|
| 7/11/18 | Step Three Response (4870-2018-B1A-07438) by Angela Dellaripa; finding no violation of applicable Prison policy, no evidence of staff misconduct, and no evidence of staff deliberate indifference; review of OPUS records indicates NO allergies noted to nylon or latex; the offender is encouraged to continue to submit sick calls and attend medical appointments to inform staff of any ongoing concerns or changes in his medical condition; the grievance is dismissed as it has been resolved (Doc. No. 82 at 35) |

## II.   LEGAL STANDARDS

### (1)   Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir.1992). A claim is stated if the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet Chevrolet, Ltd. v. Consumeraffairs.com. Inc., 591 F.3d 250, 255 (4th Cir. 2009). Nor does a court accept as true "unwarranted inferences, unreasonable conclusions, or arguments." Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 615 n. 26 (4th Cir. 2009).

### (2)   Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

**(3)    Exhaustion**

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. The PLRA's exhaustion requirement applies to all inmate suits about prison life. Porter v. Nussle, 534 U.S. 516 (2002). Exhaustion is mandatory. Id. at 524 (citation omitted); Jones v. Bock, 549 U.S. 199, 211 (2007). Exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id. A prisoner is not entitled to exhaust administrative remedies during the pendency of an action. Cannon v. Washington, 418 F.3d 714, 719 (7th Cir. 2005); Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999). The PLRA requires "proper" exhaustion, that is, "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Woodford v. Ngo, 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)).

"The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones, 549 U.S. at 218. It is well settled that a grievance does not have to mention a defendant by name so long as the grievance gives the defendant fair notice of the claim. See Moore v. Bennette, 517 F.3d 717, 729 (4th Cir. 2008). However, regardless of whether a particular defendant is named in a grievance, if the grievance fails to give prison authorities fair notice of, and the opportunity to address, the problem that will later form the basis of the suit against that defendant, dismissal of that defendant is appropriate. See Davidson v. Davis, 2015 WL 996629 at *3 (W.D.N.C. Mar. 6, 2015) (citing Johnson v.

<u>Johnson</u>, 385 F.3d 503, 516-17 (5th Cir. 2004)).

NCDPS policy has a three-step administrative remedy procedure that requires an inmate to complete all three steps.[5] Each step of grievance review has a time limit during. NCDPS Policy & Procedures .0307(f). A grievance may be rejected at any level if there has been a time lapse of more than 90 days between the alleged event and submission of a grievance. NCDPS Policy & Procedures .0306(c)(2). If an inmate does not receive a response within the time to do so at any step, the absence of a response is deemed a denial which the inmate may then appeal. NCPS Policy & Procedures .0307(f)(5).

**(4)      Deliberate Indifference**

"Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in <u>Farmer v. Brennan</u>." <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016); <u>see</u> Farmer, 511 U.S. 825, 832 (1994). First, "Farmer's objective prong requires plaintiffs to demonstrate that 'the deprivation alleged [was], objectively, sufficiently serious.'" <u>Scinto</u>, 841 F.3d at 225. In order to be sufficiently serious, the deprivation must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from ... exposure to the challenged conditions." <u>De'lonta v. Angelone</u>, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted).

As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs. See <u>Estelle v. Gamble</u>, 429 U.S. 97, 103-04 (1976). To state a case of deliberate indifference to a serious medical need, a plaintiff must

---

[5] The Court takes judicial notice of this portion of NCDPS's Policy and Procedures as a matter of public record. <u>See</u> Fed. R. Ev. 201.

show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs. <u>Heyer v. United States Bureau of Prisons</u>, 849 F.3d 202, 210 (4th Cir. 2017) (citing <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Iko</u>, 535 F.3d at 241 (internal quotation marks omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* <u>Farmer</u>, 511 U.S. at 825. However, mere negligence or malpractice does not violate the Eighth Amendment. <u>Miltier</u>, 896 F.2d at 852. Further, "mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016) (quoting <u>Wright v. Collins</u>, 766 F.2d 841, 840 (4th Cir. 1985)).

**(5)**     <u>**Sovereign Immunity**</u>

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. <u>Bright v. McClure</u>, 865 F.2d 623, 626 (4th Cir. 1989) (citing <u>McConnell v. Adams</u>, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be

subject to the same analysis. See Almone v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007); see Hutto v. S.C. Retirement Sys., 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(6)** **Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances

in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly

on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

**(7)      Punitive Damages**

A jury may be permitted to assess punitive damages in a § 1983 action when the defendant's conduct is shown to be "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others" Smith v. Wade, 461 U.S. 30, 51 (1983).

**III.      DISCUSSION**

**(1)      Motions to Dismiss**

**(A)      Defendant Jones** (Doc. No. 49)

The allegations against Defendant Jones stem from one interaction with Plaintiff on May 30, 2018 at Alexander C.I. with regards to removing latex allergy restrictions from his medical "490" card. Defendant Jones argues that the claims against him should be dismissed because Plaintiff failed to exhaust the available administrative remedies before bringing this action against him.

Plaintiff argues that he properly exhausted the available administrative remedies with regards to his claims against Defendant Jones through Grievance Number 07438, with Step One being received on May 31, 2018, Step Two being received on May 31, 2018, and Step Three being received on June 26, 2018.

Plaintiff's allegations demonstrate lack of exhaustion of the claims against Defendant Jones. The PLRA requires that exhaustion must take place *before* the commencement of the civil action in order to further the administration of justice. Porter, 534 U.S. at 524. Plaintiff filed the original Complaint on June 21, 2017 pursuant to the prisoner mailbox rule and he filed the Amended Complaint, which included Dr. Jones as a Defendant, on June 26, 2018. (Doc. Nos. 1, 14). Plaintiff admits that the Step 3 grievance was not received until June 26, 2018, which was almost a year after this action was commenced on June 21, 2017. Plaintiff has therefore failed to satisfy PLRA's exhaustion requirement. See, e.g., Hardin v. Lane, 2016 WL 6156186 (W.D.N.C. Oct. 21, 2016).

 Defendant Jones' Motion to Dismiss will be granted, and this case will be dismissed without prejudice as to Defendant Jones.

**(B)** **Defendant Sobel** (Doc. No. 71)

Plaintiff alleges that Defendant Sobel misused his power and judgment by touching Plaintiff's stomach area while wearing latex gloves, while knowing that Plaintiff had a severe allergy to latex. This incident allegedly occurred on November 24, 2016. (Doc. No. 14 at 20). Defendant Sobel argues that the claims against him should be dismissed because Plaintiff failed to exhaust the available administrative remedies, failed to state a claim, and failed to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure.

Defendant Sobel argues that Plaintiff failed to exhaust his administrative remedies by

completing the administrative remedy procedure on the claims against him. Plaintiff completed three grievances before filing this lawsuit, Grievance Numbers 00325, 00014, and 03446. None of these exhausted grievances involve Plaintiff's claims against Defendant Sobel. For instance, Grievance Numbers 00325 and 00014 involve incidents at Avery-Mitchell C.I. whereas Defendant Sobel worked at Albemarle C.I. The one exhausted grievance addressing incidents at Albemarle C.I., Grievance Number 03446, addresses his housing unit assignment and lack of accommodation for his injured feet and wheelchair. Plaintiff has therefore failed to satisfy PLRA's exhaustion requirement. See, e.g., Hardin, 2016 WL 6156186.

To the extent that the Amended Complaint suggests that Plaintiff was attempting to proceed on a medical malpractice or negligence theory against Defendant Sobel, it appears that any such claim has been abandoned. Defendant Sobel argues in the Motion for Summary Judgment that any such claim should be dismissed because Plaintiff failed to comply with North Carolina Rule 9(j). in response, Plaintiff argues that he is asserting a deliberate indifference claim, not a claim of medical malpractice so Rule 9(j) does not apply. (Doc. No. 79 at 14). Any medical malpractice/negligence claim is therefore deemed abandoned and, even if it was not abandoned, it would be subject to dismissal because Plaintiff does not refute Defendant Sobel's allegation that he failed to comply with Rule 9(j).

Defendant Sobel's Motion to Dismiss will be granted, and this case will be dismissed without prejudice as to Defendant Sobel.

**(2)** **Motion for Summary Judgment** (Doc. No. 64)

Plaintiff alleges that Defendant D'Amico was deliberately indifferent to a serious medical need with regards to his treatment of Plaintiff's latex allergy. In his Response to the Motion for Summary Judgment, he specifically complains that Defendant D'Amico conducted a painful latex

allergy test that he was not qualified to perform and discontinued medication that had been prescribed by Dr. Umesi and P.A. Hendricks without Plaintiff's knowledge.

The medical records and Defendant D'Amico's affidavit reveal that Defendant D'Amico actively monitored and treated Plaintiff's medical complaints, submitted several UR Requests on Plaintiff's behalf including urgent requests, obtained non-latex shower shoes for Plaintiff, and referred Plaintiff to a dermatologist despite negative test results for a latex allergy. The medical records reveal that Defendant D'Amico persistently and conscientiously followed Plaintiff's care. With regards to the patch test, Defendant D'Amico states in his affidavit that he is qualified to order such a test, that he ordered Plaintiff to be monitored for the first 30 minutes and instructed that Plaintiff discontinue the test if he experienced distress, and conducted the test in order to overcome the UR's denial of non-latex materials due to a prior negative test result. Defendant D'Amico's affidavit and the medical records overcome Plaintiff's conclusory and unsupported allegations that D'Amico was deliberately indifferent to his care, purposefully subjected him to the patch test in order to cause him pain, was unqualified to conduct the test, and was otherwise indifferent to his alleged latex allergy. With regards to the medication that Dr. Umesi and PA Hendricks had prescribed, the medical records reveal that the medication was discontinued the same day that two other medications were added and the UR approved Defendant D'Amico's request that Plaintiff see a dermatologist. See (Doc. No. 65-8 at 2-4). Plaintiff has failed to demonstrate the existence of any genuine dispute of material fact regarding whether Defendant D'Amico was deliberately indifferent to his latex allergy or caused Plaintiff any pain or harm through his acts or omissions. Plaintiff's mere disagreement with the course of treatment he received from Defendant D'Amico fails to support a deliberate indifference claim. Scinto, 841 F.3d at 225 (citation omitted). Therefore, Defendant D'Amico's Motion for Summary Judgment

will be granted on Plaintiff's § 1983 deliberate indifference claim.

Plaintiff's claims for damages against Defendant D'Amico under § 1983 in his official capacity are equivalent to suits against the State and are barred by the Eleventh Amendment. <u>See generally Will</u>, 491 U.S. at 66; <u>Graham</u>, 473 U.S. at 166; <u>see</u>, <u>e.g.</u>, <u>Hutto</u>, 773 F.3d at 549. Therefore, no damages are available on Plaintiff's § 1983 claims against Defendant D'Amico for damages in his official capacity.

Defendant D'Amico argues that he is entitled to qualified immunity because his actions with regards to Plaintiff's care were reasonable and he did not violate any of Plaintiff's clearly established rights. Plaintiff has failed to establish that a constitutional violation occurred and Defendant D'Amico has submitted uncontroverted evidence demonstrating that his conduct was reasonable. Defendant D'Amico had no reason to know that he was violating any of Plaintiff's clearly established rights through his actions or inactions. Defendant D'Amico is therefore entitled to qualified immunity.

To the extent that the Amended Complaint suggests that Plaintiff was attempting to proceed on a medical malpractice or negligence theory against Defendant D'Amico, it appears that any such claim has been abandoned. Defendant D'Amico argues in the Motion for Summary Judgment that any such claim should be dismissed because Plaintiff failed to comply with North Carolina Rule 9(j). In response, Plaintiff argues that Rule 9(j) does not apply to this Eighth Amendment claims of deliberate indifference. (Doc. No. 82 at 6). Any medical malpractice/negligence claim is therefore deemed abandoned and, even if it was not abandoned, it would be subject to dismissal because Plaintiff does not refute Defendant D'Amico's allegation that Plaintiff failed to comply with Rule 9(j).

Plaintiff's allegations do not support an award of punitive damages against Defendant

D'Amico on his § 1983 claims. Aside from his own conclusory, unsupported and unverified allegations, Plaintiff has presented no evidence to support a finding that Defendant D'Amico acted with malice or with willful intent to deprive him of his constitutional rights. Therefore, punitive damages are not available.

For the foregoing reasons, Defendant D'Amico's Motion for Summary Judgment will be granted.

## IV.     PLAINTIFF'S MOTIONS

### (1)     Motion for Preliminary Injunction

Plaintiff has filed a "Letter of Declaration," (Doc. No. 42), that was docketed as a Motion for Preliminary Injunction. Plaintiff asks the Court to direct Defendants to immediately stop using latex gloves at the facility and issue Plaintiff cloth mattresses and pillows "as once prescribed by a physician," to protect his health and life from the imminent danger of irreparable harm. (Doc. No. 42 at 2).

The Avery C.I. Defendants (James Watson, Chad Clark, Phillip Bailey, Landon Porshia, Robert Pittman, Mark R. Geouge, Nicholas R. Hensley) and the Alexander C.I. Defendants (Benjamin Anderson, Ken Beaver, Thomas Bell, Pamela Chapman, Josh L. Crisp, William Glick III, Stephanie Hall, Sheana Litaker, Jason Penland, Isaac Quintero, Michael W. Swink, Bobby Tate, Michael D. Thompson, and Dean C. Walsh), have filed a Response in Opposition to Plaintiff's Motion for Preliminary Injunction. (Doc. No. 47). They argue that Plaintiff is presently housed at Johnston C.I. so an injunction against any of the responding Defendants would not be effective to enjoin any person currently performing custodial duties with Plaintiff. The Facility Administrator at Johnston C.I. where Plaintiff currently resides, Mr. Roderick Watson, is not a defendant in this case and the Court does not currently have personal jurisdiction to enjoin him or

anyone else at Johnston C.I. who are not defendants in this case.

Even if the Court had authority to enter a temporary restraining order or preliminary injunction, this Motion is not substantially different from Plaintiff's first motion for injunctive relief and will be denied for the same reasons. <u>See</u> (Doc. No. 32).

**(2)**     **Motion to Compel Discovery**

Plaintiff has filed a "Summons," post-marked April 4, 2019, and is docketed as a Motion to Compel. (Doc. No. 86). The document is entitled "Notice of Declaration by Witnesses" and refers to Gerald Ebert and Dennis Holland, both of whom work at the Johnston C.I. in Johnston County, North Carolina, and are not parties to this case. (<u>Id.</u>). Plaintiff asks that Ebert and Dennis provide written declarations in reference to Plaintiff's "severe latex allergy" within 20 days after service of the "Summons." (<u>Id.</u>).

The Avery C.I. and Alexander C.I. Defendants have filed a Response in Opposition, arguing that this document is not an appropriate discovery request pursuant to Rule 26, 30, 31, 33, 34 or 45 of the Federal Rules of Civil Procedure and ask that the Court deny any relief or, alternatively, issue a protective order relieving these third parties from the responsibility to respond to the document. (Doc. No. 88).

District courts enjoy "considerable discretion in overseeing discovery…." <u>Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.</u>, 748 F.3d 160, 172, 178 (4th Cir. 2014). All civil discovery, whether sought from parties or nonparties, is limited in scope by Rule 26 in two fundamental ways. First, the matter sought must be "relevant to any party's claim or defense," and second, discovery must be "proportional to the needs of the case…." Fed. R. Civ. P. 26(b)(1). Proportionality requires courts to consider, among other things, "whether the burden or expense of the proposed discovery outweighs its likely benefit." <u>Id.</u> This relieves parties from the burden of taking unreasonable steps

to ferret out every relevant document. When discovery is sought from nonparties, however, its scope must be limited even more. <u>Va. Dep't of Corr. v. Jordan</u>, 921 F.3d 180, 184 (4th Cir. 2019). Nonparties are "strangers" to the litigation, and since they have "no dog in [the] fight," they have "a different set of expectations" from the parties themselves. <u>Cusumano v. Microsoft Corp.</u>, 162 F.3d 708, 717 (1st Cir. 1998).

Plaintiff's request for two non-parties to submit written declarations about his alleged latex allergy where those individuals do not work at the institutions in question and have no apparent involvement in the instant case, exceeds the bounds of proper discovery. The request is neither relevant to this case or proportional to the needs of the case. Therefore, Plaintiff's "Summons" is construed as a Motion to Compel Discovery from third parties and will be denied.

**(3)** **<u>Motion to Amend</u>**

On February 4, 2019, Plaintiff filed a Motion seeking to add the following defendants to the Amended Complaint: Facility Administrator Roderick Watson, Assistant Superintendent of Programs and Supervisory of the Medical Department Christopher Batten, Sergeant Smith, Sergeant Hill, Nurse Supervisor Lisa Hallman, Officer Jones, Inmate Grievance Resolution Board Member Faustina F. Brown, Grievance Processor/Administrator Juli M. Sharek. (Doc. No. 70).

A plaintiff may amend the complaint once as a matter of course within 21 days after serving the complaint, or within 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), which is earlier. Fed. R. Civ. P. 15(a)(1). A plaintiff may subsequently amend with permission from the court which "shall be freely granted when justice so requires." Fed. R. Civ. P. 15(a)(2). The Fourth Circuit "ha[s] interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment

would have been futile.'" <u>Laber v. Harvey</u>, 438 F.3d 404, 426 (4th Cir. 2006) (*en banc*) (quoting <u>Johnson v. Oroweat Foods Co.</u>, 785 F.2d 503, 509 (4th Cir. 1986)).

Plaintiff fails to attach a proposed Second Amended Complaint to his Motion and piecemeal amendment will not be permitted. <u>See</u> (Doc. No. 11 at 19) (informing Plaintiff that "[a]ny Amended Complaint will supersede the original Complaint….").

Even if Plaintiff had filed a proposed Second Amended Complaint, it is unclear whether such amended would be permitted. The Court cannot determine at this time whether the claims against the additional Defendants are part of the same transaction or occurrence as the operative Amended Complaint, whether justice requires such an amendment, whether prejudice would ensue, or whether amendment would be futile. <u>See</u> <u>generally</u> Fed. R. Civ. P. 15(a); Fed. R. Civ. P. 20. For all the foregoing reasons, Plaintiff's Motion to Amend will be denied.

**(4)**      **Motions for the Appointment of Counsel**

Plaintiff has filed Motions asking the Court to appoint counsel to assist him with this case. (Doc. Nos. 76, 93). In support of his Motion, Plaintiff states that he is indigent and is proceeding *in forma pauperis*, that North Carolina Prisoner Legal Services is appointed to assist him with discovery in a similar case, his imprisonment will greatly limit his ability to litigate, review, and receive documents needed for discovery, the issues in the case are complex and will require significant research and preparation including depositions and eyewitness examinations, applying the rules of evidence, and making opening statements that are beyond Plaintiff's abilities, Plaintiff has limited access to a law library, copies of documents, and knowledge of the law, NCPLS is currently in possession of documents and/or influential materials to be used for discovery, and a trial will likely involve conflicting testimony and cross-examination that counsel would be better able to address.

There is no absolute right to the appointment of counsel in civil actions such as this one. Therefore, a plaintiff must present "exceptional circumstances" in order to require the Court to seek the assistance of a private attorney for a plaintiff who is unable to afford counsel. Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987).

The record reflects that Plaintiff has been able to adequately represent himself in these proceedings. This case does not present exceptional circumstances that justify appointment of counsel. Therefore, Plaintiff's motion seeking the appointment of counsel will be denied.

## V. CONCLUSION

In sum, for the reasons stated herein, Defendants Jones and Sobel's Motions to Dismiss are granted, Defendant D'Amico's Motion for Summary Judgment is granted, and Plaintiff's pending motions are denied.

**IT IS, THEREFORE, ORDERED** that:

1.  Defendant William Jones' Motion to Dismiss, (Doc. No. 49), is **GRANTED**.

2.  Defendant Gary Sobel's Motion to Dismiss, (Doc. No. 71), is **GRANTED**.

3.  Defendant Keith D'Amico's Motion for Summary Judgment, (Doc. No. 64), is **GRANTED**.

4.  Plaintiff's "Letter of Declaration," (Doc. No. 42), is construed as a Motion for Preliminary Injunction and is **DENIED**.

5.  Plaintiff's "Summons," (Doc. No. 86), is construed as a Motion to Compel Discovery and is **DENIED**.

6.  Plaintiff's Motion to Amend Complaint Adding Defendants, (Doc. No. 70), is **DENIED**.

7.  Plaintiff's Motions for the Appointment of Counsel, (Doc. Nos. 76, 93), are **DENIED**.

8.  Plaintiff's Motion to Compel Discovery, (Doc. No. 86), is **DENIED**.

9.  The Clerk of Court is instructed to terminate this action as to Defendants Jones, Sobel, and D'Amico.

Signed: June 6, 2019

Frank D. Whitney
Chief United States District Judge